IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RITA'S WATER ICE FRANCHISE COMPANY, LLC | : | CIVIL ACTION |
| Plaintiff, | : | NO. 10-4297 |
| v. | : | |
| S.A. SMITH ENTERPRISES, LLC, et. al. | : | |
| Defendants. | : | |

**OPINION**

**Slomsky, J.** **January 10, 2011**

## I. INTRODUCTION

Before the Court are Plaintiff Rita's Water Ice Franchise Company, LLC's Motion for a Preliminary Injunction (Doc. No. 2), Plaintiff's Memorandum of Law and Supplemental Memorandum of Law in Support of its Motion (Doc. Nos. 21 and 7), and Defendants S.A. Smith Enterprises, LLC, Shirley A. Smith, and Jeffrey B. Smith's Memorandum in Opposition to Plaintiff's Motion (Doc. No. 22).

The dispute here concerns Defendants alleged breach of a franchise agreement entered into with Plaintiff. Specifically, Plaintiff alleges that Defendants breached the terms of the Franchise Agreement by prematurely ceasing operation of their Rita's Franchise and then opening a competing business at the same location where the Franchise did business. In its Motion for a Preliminary Injunction, Plaintiff seeks to enjoin Defendants from continuing to operate their competing business and to compel Defendants to return certain machine parts as

provided under the Franchise Agreement.

For the reasons that follow, the Court will grant Plaintiff's Motion for a Preliminary Injunction (Doc. No. 2).

## II. PROCEDURAL HISTORY

On August 24, 2010, Plaintiff initiated this lawsuit by filing the Complaint (Doc. No. 1). That same day Plaintiff filed its Motion for a Temporary Restraining Order and for a Preliminary Injunction (Doc. No. 2). On August 25, 2010, after a hearing held that day, the Court denied Plaintiff's Motion for a Temporary Restraining Order (Doc. No. 4) and issued an Order scheduling a hearing on Plaintiff's outstanding Motion for a Preliminary Injunction (Doc. No. 3). On September 3, 2010, Plaintiff filed its Supplemental Memorandum of Law in Support of its Motion for a Preliminary Injunction (Doc. No. 7).

On September 8 and 10, 2010, the Court held a hearing on Plaintiff's Motion for a Preliminary Injunction.[1] On December 14, 2010, Plaintiff filed a Memorandum of Law in Support of its Motion for a Preliminary Injunction. (Doc. No. 21.) That same day, Defendant filed its Memorandum in Opposition to the Motion for a Preliminary Injunction (Doc. No. 22) and its Answer to the Complaint (Doc. No. 23.)

## III. FACTUAL BACKGROUND

On July 19, 2007, Plaintiff Rita's Water Ice Franchise Company, LLC and Defendants Shirley and Jeffrey Smith entered into a franchise agreement, titled "Rita's Water Ice Franchise

[1] The Court delayed issuing an Opinion on the Motion for a Preliminary Injunction because the parties were in settlement negotiations. The parties did not settle the matter and, pursuant to this Court's November 24, 2010 Order (Doc. No. 17), each submitted a brief on December 14, 2010 in support of or in opposition to the instant Motion.

LLC Franchise Agreement" (the "Franchise Agreement" or the "Agreement"). (Plaintiff Exhibit 2 ("Ex. P-2"); September 8, 2010 Hearing Transcript ("Sept. 8 Hr'g Tr.") at 23-24.) On July 29, 2010, pursuant to the terms of the Franchise Agreement, Defendants Shirley and Jeffrey Smith transferred their interest in the Franchise Agreement to Defendants S.A. Smith Enterprises, LLC in another written agreement (the "Transfer Agreement"). (Plaintiff Exhibit 3 ("Ex. P-3 "); Sept. 8 Hr'g Tr. 24-25.) Defendant Shirley Smith is a ninety-percent shareholder and Defendant Jeffrey Smith is a ten-percent shareholder in Defendant S.A. Smith Enterprises. (Sept. 8 Hr'g Tr. 25.) Although Defendants Shirley and Jeffrey Smith transferred their interest in the Franchise Agreement, the Transfer Agreement provides that they remain personally liable under the Franchise Agreement. (Ex. P-3.)

**A. Terms of the Franchise Agreement**

Pursuant to the Franchise Agreement, Defendants paid Plaintiff $35,000 and agreed to pay Plaintiff a royalty fee of six-and-a-half percent of estimated gross sales. (Ex. P-2 ¶¶ 4.1, 4.2; September 10, 2010 Hearing Transcript ("Sept. 10 Hr'g Tr.") at 29.) In addition, Defendants agreed to operate a Rita's Franchise for ten (10) years in accordance with Plaintiff's Standards of Operation, which required, among other things, that Defendants adhere to product and service quality standards, comply with operation and preparation methods, maintain, refurbish and modify store premises and equipment as needed and/or directed by Plaintiff, and allow Plaintiff to enter the Franchise premises to ensure Defendants' compliance with these standards. (Ex. P-2 ¶¶ 7.1-7.21.) Defendants also agreed to purchase and install certain fixtures and equipment

including Plaintiff's "proprietary batch machine."[2] (Id. ¶ 7.4.)

In exchange, Plaintiff granted Defendants the right to operate a Rita's Franchise as well as the right to use confidential and proprietary information regarding the establishment and operation of a Rita's store (the "System"). (Ex. P-2 ¶¶ 1, 8-10.) The confidential and proprietary information that comprises the System includes Rita's recipes, food preparation, and business and management practices. (Id. ¶ 10.)

In signing the Franchise Agreement Defendants made several promises regarding the confidential information that forms the System. Specifically, Defendants agreed to "(1) not use the Confidential Information in any other business or capacity during and after the term of [the Franchise] Agreement; (2) to maintain the absolute confidentiality of the Confidential Information during and after the term of [the Franchise] Agreement; (3) to not make unauthorized copies of any portion of the Confidential Information and maintain restrictions on disclosure thereof to their employees by reasonable methods; and (4) to not disclose or permit access to any Confidential Information by any person, except for employees requiring access in order for the defendants to fulfill their obligations under [the Franchise] Agreement." (Id.)

The Franchise Agreement provides for a term of ten (10) years, with an option for Plaintiff to terminate it unilaterally under certain conditions. (Ex. P-2 ¶ 2.1.) The Franchise Agreement provides that Plaintiff may: (1) terminate the Agreement at any time without affording Defendants the opportunity to cure if Defendants cease operations of their Rita's

---

[2] Roger Falloon, Rita's Vice President of Operations, testified that Rita's proprietary batch machine is used to produce Italian ice and cream ice. (Sept. 10 Hr'g Tr. at 126-38.) He testified that Rita's worked with the manufacturer to create and develop the machine so that it would produce a "finer product." (Id. at 127.) He stated that the machine improved the product and gave the seller of such product an advantage. (Id. at 128.)

Franchise; or (2) terminate the Agreement if, after failing to comply with the terms of the Agreement and being given an opportunity to cure, Defendants fail to comply with its terms. (Id. ¶¶ 15.2-15.3.)

The Franchise Agreement provides that, upon termination, Defendants will cease their use of any confidential methods, procedures and techniques associated with the System and will return all materials relating to the operation of the System. (Id. ¶¶ 16.1-16.7.) It also provides that, upon termination, Plaintiff may purchase from Defendants "the "dasher" and "door" of each batch machine used in, or intended for use in, the operation of the Franchised Business for a price of One-Hundred Dollars ($100) per machine."[3] (Id. ¶ 16.8.)

Finally, the Franchise Agreement provides that, upon its termination, Defendants will adhere to the restrictions of a "non-compete clause." (Id. ¶¶ 16.10, 17.3.) The relevant portion of the Franchise Agreement states:

> 17.3 Post Term Covenants. Franchisee covenants that, except as otherwise approved in writing by the Company, Franchisee shall not, for a continuous uninterrupted period commencing upon the expiration or termination of this Agreement, regardless of the cause for termination, and continuing for two (2) years thereafter, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person, persons, partnership, corporation or limited liability company, own, maintain, operate, engage in, act as a consultant for, perform services for, or have any interest in any retail business which: (a)(i) is the same as, or substantially similar to, a Rita's shop; (ii) offers to sell or sells any product or products which are the same as, or substantially similar to, any of the Proprietary Products; or (iii) offers to sell or sells any product or products which are the same as, or substantially similar to, any of the products offered by a Rita's shop where the sale of such products constitutes or is intended to constitute twenty percent (20%) or more of the gross sales of the business operated or intended to be operated; and (b) is, or

[3] The purpose of paragraph 16.8, which gives Plaintiff the option to repurchase the dasher and door of this machine, is to render the machine inoperable and to prevent a former franchisee from using the machine to produce products that could be used to compete with Plaintiff. (Sept. 10 Hr'g Tr. at 128.)

is intended to be, located at or within:

> 17.3.1 Franchisee's Territory;
>
> 17.3.2 Three (3) miles of Franchisee's Territory; or
>
> 17.3.3 Three (3) miles of any Rita's shop operating under the System and the Proprietary Marks.

(Ex. P-2 ¶ 17.3.)[4]

**B. Alleged Breach of the Franchise Agreement**

On July 19, 2010, Defendants, without providing notice to Plaintiff or obtaining its consent, ceased operation of their Rita's Franchise. (Doc. No. 1 ¶ 41.) Plaintiff alleges that this act is a breach of the Franchise Agreement. It serves as the basis for the breach of contract claim contained in Count I of the Complaint. (Id. ¶¶ 53-58.) On July 20, 2010, Plaintiff sent a letter to Defendants informing them that they were in breach of the Franchise Agreement by discontinuing their operation of their Rita's Franchise. (Plaintiff's Exhibit 7 ("Ex. P-7").) In a letter dated August 19, 2010, Plaintiff exercised its option pursuant to paragraph 16.8 of the Franchise Agreement to repurchase the "dasher" and "door" of Rita's proprietary batch machine. (Plaintiff's Exhibit 13 ("Ex. P-13").)[5]

---

[4] The Franchise was located at 2080 Timothy Road, Athens, Georgia 30606. The Franchise Territory is defined as a two and one half mile radius surrounding the franchise location. (Plaintiff's Exhibit 4 ("Ex. P-4").)

[5] The parties dispute the significance of two letters, both dated July 1, 2010 and both sent from Plaintiff's Director of Franchising, Lauriena Borstein, to Shirley and Jeffrey Smith. (Defendant's Exhibits 5 and 6 ("D-5 and D-6").) Defendant contends that Plaintiff terminated the Franchise Agreement by one of the letters, D-6, prior to Defendants ceasing operation of the Rita's shop. Defendant argues that as a result they did not breach the Franchise Agreement by ceasing operation and only did so in reaction to Plaintiff's letter terminating the Agreement.

Plaintiff contends that this letter refers to a September 30, 2008 Franchise Agreement (the

Shortly after Defendants stopped operating their Rita's shop, they began operating a similar business at the same location under the name Pearly's Sweet Creative Desserts ("Pearly's Sweets" or "Pearly's"). (Doc. No. 1 ¶ 43; Plaintiff's Exhibit 11 ("Ex. P-11").) Plaintiff alleges that this action violates the non-compete clause contained in paragraph 17.3 of the Franchise Agreement and serves as the basis for the claim contained in Count II of the Complaint, breach of Franchise Agreement's Post-Termination Covenants. (Id. ¶¶ 59-63.) Plaintiff notified Defendants that their operation of Pearly's Sweets violated paragraph 17.3 of the Franchise Agreement in two letters dated July 27, 2010 and August 5, 2010. (Plaintiff's Exhibits 8 and 9 ("Ex. P-8" and "Ex. P-9").)

**C. Competing Products**

At the September 8, 2010 and September 10, 2010 hearings, the parties presented extensive testimony regarding the ingredients and preparation of products sold at both Rita's and at Pearly's Sweets. Pearly's Sweets sells soft serve ice cream, Pearly's Italian ice, "Pearlatis" and "Pearly's Shakes." (Defendant's Exhibit 24 ("D-24") at 2-3.) Rita's offers frozen custard, Italian ice, "Gelatis," and "Misto Shakes." (Sept. 8 Hr'g Tr. at 50-52.)

---

"2nd Franchise Agreement of a 3 Store Development Agreement, (Plaintiff's Exhibit 13, "Ex. P-13")) and terminates that Agreement and that Defendants subsequent act of closing their Rita's shop breached the July 19, 2007 Franchise Agreement, which remained in effect.

At issue in the present Motion is the *post-termination* covenant not to compete contained in paragraph 17.3 of the July 19, 2007 Franchise Agreement. This non-compete clause applies whether the Agreement expires or terminates. It applies "regardless of the cause for termination." (Ex. P-2 ¶ 17.3.) Here, neither party disputes that the Franchise Agreement has terminated. Accordingly, whether Defendants breached the Franchise Agreement by closing their Rita's Franchise or whether Plaintiff exercised its option to terminate the Agreement prior to Defendants' alleged breach, is of no consequence to the application of the non-compete. It applies here regardless of the effect of these two letters.

Defendant Shirley Smith testified that a "Gelati" is prepared by layering Italian ice and frozen custard. (Sept. 8 Hr'g Tr. at 50-51.) She stated that Pearly's Sweets sold a similar item, a "Pearlati," using Italian ice and soft-serve ice cream. (Id. at 43:14-15; 50:12-15) She distinguished these products by noting that custard, unlike Pearly's soft-serve ice cream, contains milk and eggs. (Id. at 51.) She admitted that Defendants continue to use Plaintiff's proprietary batch machine to produce Italian ice for sale at Pearly's Sweets. (Id. at 64: 8-12.)

Despite Defendants' attempt to distinguish soft serve ice cream from custard, Italian ice from Pearly's Italian ice, "Pearlatis" from "Gelatis" and "Pearly's Shakes" from "Misto Shakes," the Court finds that soft serve ice cream, Pearly's Italian ice, "Pearlatis" and "Pearly's Shakes" are products competing with those of Plaintiff.

### D. Relief Sought

By its Motion for a Preliminary Injunction (Doc. No. 2), Plaintiff seeks to enforce the restrictive covenant contained in paragraph 17.3 of the Franchise Agreement, which would enjoin Defendants from continuing to sell competing products at Pearly's Sweets and to compel Defendants to return the dasher and door of the batch machine as required when Plaintiff exercises its option pursuant to paragraph 16.8 of the Agreement.

## IV. JURISDICTION

### A. Diversity Jurisdiction

Plaintiff submits that this Court has original jurisdiction over the subject matter of the action pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds $75,000 and because Plaintiff and Defendants are citizens of different states. (Doc. No. 1 ¶ 1.) Title 28, United States Code, Section 1332 provides: "The district courts shall have original jurisdiction of

all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States."

Defendants do not dispute that Plaintiff is a citizen of a state different from the state of citizenship of Defendants. They argue, however, that the Complaint fails to meet the jurisdictional threshold of $75,000, and for this reason the Court does not have jurisdiction over the subject matter of the litigation. (Doc. No. 22 at 3.)[6] More specifically, Defendants assert that Plaintiff is seeking unpaid royalties that it would have received if Defendants had operated their franchise for the ten-year period as directed by the Franchise Agreement. (Id. at 3 (citing Doc. No. 1 ¶ 30).) Defendants calculate this amount to be $35,000 and argue that because this amount is less than the jurisdictional threshold, the Court does not have subject matter jurisdiction. (Id.)

Although Defendants may be correct that the total amount of unpaid royalties would be $35,000, this amount does not represent the total value of the damages and other relief requested in the Complaint. In addition to seeking money damages for unpaid royalties (Doc. No. 1 ¶ 58), Plaintiff requests damages for injury to its goodwill in an amount representing ongoing and

---

[6] Although the Court will address the merits of Defendants' argument, in the Answer to the Complaint, Defendants have conceded that this Court has jurisdiction over the subject matter of the litigation. In Paragraph 1 of the Answer, Defendants "admit[] the allegations in paragraphs 1-7" of the Complaint. (Doc. No. 23.) Encompassed within these paragraphs is Plaintiff's statement of jurisdiction; specifically, that "[t]his [C]ourt has original jurisdiction over the subject matter if this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000, exclusive of interests and costs, and is between citizens of different states." (Doc. No. 1 ¶ 1.)

"An answer is a judicial admission, and as such binds the party who makes it, establishes the truth of the admitted fact for the purposes of the instant proceedings, and may 'estop' the party from making a contrary argument at trial and on appeal." Weaver v. Conrail, Inc., No. 09-5592, 2010 WL 2773382, at *8 (E.D. Pa. July 13, 2010) (Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 211 n. 20 (3d Cir. 2006)). However, because Defendants' argument concerns this Court's jurisdiction, the Court will address the merits of this claim.

future lost profits caused by Defendant's unfair competition (Id. ¶ 63) and for the amount of the benefit Defendants retained and are unjustly enriched by on account of their continued, unauthorized use of the confidential System Information of Plaintiff (Id. ¶ 71). In its Prayer for Relief, Plaintiff also requests, among other things, injunctive relief enjoining Defendants from operating their business in violation of the non-compete clause and compelling Defendants to return documents representing confidential System Information and machine parts. (Id. ¶¶ A-L.)

"When a party seeks injunctive relief, the amount in controversy is determined by 'the value of the object of the litigation.'" Schuylkill Twp. v. CitySwitch, LLC, No. 08-5681, 2009 WL 2018531, *4 (E.D. Pa. July 13, 2009) (Columbia Gas Transmission Corp. v. Tarbuck, 62 F.3d 538, 541 (3d Cir.1995)). The amount in controversy is therefore measured "by the value of the right sought to be protected by the equitable relief." Id. The value of the relief requested is determined from the viewpoint of Plaintiff. Id.

Upon executing the Franchise Agreement, Defendants paid Plaintiff $35,000 and agreed to pay Plaintiff a royalty fee of six-and-a-half percent of estimated gross sales. (Ex. P-2 ¶¶ 4.1, 4.2; Sept. 10 Hr'g Tr. at 29.) Defendants calculate the amount of unpaid royalties to be $35,000. (Doc. No. 22 at 3.) Since Defendants initially paid $35,000 for the right to use Plaintiff's confidential and proprietary information, the Court finds that the value of the right to use such information to be at least $35,000.

In addition, the Court heard testimony stating that the value of the batch machines, to which Plaintiff claims a right, is $21,000. (Sept. 10 Hr'g Tr. at 208.) This amount, when

combined with Defendants' estimate of the amount of unpaid royalties[7] and the value of the right to use Plaintiff's confidential and proprietary information, exceeds the jurisdictional threshold. Therefore, without determining the exact value of the damages and other injunctive relief requested by Plaintiff, the Court finds that the amount in controversy exceeds the jurisdictional threshold and that the Court has jurisdiction over the subject matter of this case.

### B. **The Arbitration Provision**

Defendants argue that Plaintiff's "failure to arbitrate prior to initiating this action suppresses the court's jurisdiction to arbitrate the underlying lawsuit." (Doc. No. 22 at 2.) However, the Arbitration Provision of the Franchise Agreement does not "prevent [Plaintiff] from applying to and obtaining from any court having jurisdiction a writ of attachment, a temporary injunction, preliminary injunction and/or other emergency relief available to safeguard and protect [Plaintiff's] interests." (Doc. No. 1, Ex. "A" ¶ 25.4.) Therefore, the Arbitration Provision does not deprive this Court of jurisdiction to decide Plaintiff's Motion for a Preliminary Injunction.

## V. STANDARD OF REVIEW

A party may move for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65. In order to obtain a preliminary injunction the moving party must show: (1) a reasonable probability of success on the merits; (2) irreparable harm if the relief sought is not

---

[7] The Court does not find that Defendants' calculation of the value of unpaid royalties is accurate. The Court is using this estimate only for the purpose of showing that the relief requested exceeds the jurisdictional threshold and is sufficient to give this Court subject matter jurisdiction.

granted; (3) that the harm to the moving party outweighs the possible harm to the non-moving party; and (4) that granting relief is in the public interest. Singh v. Sch. Dist. of Phila., No. 10-2828, 2010 WL 32203366, at *6 (E.D. Pa. Aug. 11, 2010) (citing Acierno v. New Castle County, 40 F.3d 645, 653 (3d Cir. 1994)); see also Bimbo Bakeries USA, Inc. v. Botticella, 613 F.3d 102, 109 (3d Cir. 2010). "A court will issue a preliminary injunction '[o]nly if the movant produces evidence sufficient to convince the trial judge that all four factors favor preliminary relief.'" Id. (citing Optician's Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 192 (3d Cir.1990)).

As a form of injunctive relief, the grant of a preliminary injunction is "an extraordinary remedy," which should be granted only in "limited circumstances." Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 800 (3d Cir.1989) (internal quotation omitted). "Before granting a preliminary injunction, a district court must consider the extent to which the moving party will suffer irreparable harm without injunctive relief." Liberty Lincoln-Mercury, Inc. v. Ford Motor Co., 562 F.3d 553, 557 (3d Cir. 2009).

## VI. DISCUSSION

Based on the testimony elicited at the September 8, 2010 and September 10, 2010 hearings, the Exhibits and Memorandums submitted by the parties, and an evaluation of the factors to be considered before issuing a preliminary injunction, the Court finds that Plaintiff is entitled to injunctive relief. The Court will analyze each of the above factors in turn.

### A. Probability of Success on the Merits

The Franchise Agreement's choice of law provision requires the application of Pennsylvania law. (P-2 ¶ 25.1.) Neither party challenges the application and enforceability of

this provision. Therefore, in determining whether Plaintiff is likely to succeed on the merits of its claim, the Court will consider whether the non-compete clause pursuant to which Plaintiff brings its claims is enforceable under Pennsylvania law.

Under Pennsylvania law, a covenant not to compete is enforceable if: "(1) the covenant relate[s] to either a contract for the sale of goodwill or other subject property or to a contract for employment; (2) the covenant [is] supported by adequate consideration; and (3) the application of the covenant [is] reasonably limited in both time and territory." Maaco Franchising, Inc. v. Augustin, No. 09-4548, 2010 WL 1644278, at *3 (E.D. Pa. Apr. 20, 2010) (quoting Piercing Pagoda, Inc. v. Hoffner, 351 A.2d 207, 210 (Pa. 1976)). Neither party disputes that the first two requirements are fulfilled, since it is well-settled that a non-compete clause in a franchise agreement relates to the sale of goodwill and since the Franchise Agreement is supported by adequate consideration on both sides. See Athlete's Foot Mktg. Assocs. v. Zell Inv., Inc., No. 00-0186, 2000 WL 426186, at *9-10 (W.D. Pa. Feb 17, 2000) (citing Piercing Pagoda, 351 A.2d at 210). Defendants argue that the non-compete clause is unenforceable because it is unreasonable in both time and territory.

The time duration and geographic scope of the restrictive covenant contained in paragraph 17.3 of the Franchise Agreement are two years and three miles, respectively. (Ex. P-2 ¶ 17.3.) The Court finds the two-year time duration and three-mile geographic scope of the covenant to be reasonable under Pennsylvania law. Similar to the restrictive covenant at issue in Athlete's Foot Mktg. Assocs. v. Zell Inv., Inc., the restrictive covenant here "is intended to give [Plaintiff, the franchisor], the opportunity to establish a new franchise[] in the area while there is still customer loyalty and brand recognition in place." No. 00-0186, 2000 WL 426186, at *10.

The Court heard testimony that it would take Plaintiff "multiple years" to establish another franchise in the territory in which Defendants' Franchise has been located. (Sept. 10 Hr'g Tr. at 141.) A two-year restrictive covenant would be necessary to give Plaintiff the opportunity to establish a new franchise in this location. In addition, Pennsylvania courts have upheld non-compete clauses with longer durations. See, e.g. Piercing Pagoda, 351 A.2d at 212 (granting injunctive relief to enforce a three-year restraint on competition); Novus Franchising, Inc. v. Taylor, 795 F. Supp. 122, 128 (M.D. Pa. 1992) (finding the two-year time duration on the restrictive covenant at issue was reasonable as it was necessary to allow the Franchisor "to seek, train, and bring up to speed replacement franchises"). Therefore, the two-year time duration of the non-compete clause is reasonable under Pennsylvania law.

The three-mile geographic scope of the non-compete clause is also reasonable. See Athlete's Foot, No. 00-0186, 2000 WL 426186, at *11 (enforcing a restrictive covenant contained in a franchise agreement with a five-mile geographic radius); Maaco, No. 09-4548, 2010 WL 1644278, at *3 (finding a ten-mile radius reasonable in its geographic scope because the franchisor could draw customers from up to ten miles from the franchise).

Having established that the restrictive covenant at issue is enforceable under Pennsylvania law, Plaintiff has demonstrated a reasonable probability of success on the merits of its claim. This factor favors granting injunctive relief.

### B. Irreparable Harm if the Relief Sought is Not Granted

"The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary

damages." Adams v. Freedom Forge Corp., 204 F.3d 475, 484-85 (3d Cir. 2000). This is a heavy burden. Id. Monetary loss alone is insufficient to show irreparable harm. Liberty Lincoln-Mercury, Inc. v. Ford Motor Co., 562 F.3d 553, 557 (3d Cir. 2009). "Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill." Pappan Enters., Inc. v. Hardee's Food Sys., Inc., 143 F.3d 800, 805 (3d Cir. 1998).

"Irreparable injury results when a former franchisee competes against a franchisor in breach of a restrictive covenant contained in the parties' franchise agreement." Athlete's Foot, No. 00-0186, 2000 WL 426186, at *11. Accord Rita's Water Ice Franchise Corp. v. DBI Inv. Corp., No. 96-306, 1996 WL 165518, at *4 (E.D. Pa. Apr. 8, 1996). A franchisor has an interest in retaining an established customer base in an area where it has established a franchise location. Athlete's Foot, No. 00-0186, 2000 WL 426186, at *11. It has an interest in capitalizing on its established goodwill by placing a new franchise in the area as soon as possible. See DBI Inv. Corp., No. 96-306, 1996 WL 165518, at *4. A franchisor's business reputation is irreparably harmed when a former franchisee continues to operate at a franchise location after the expiration of a franchise agreement in violation of a non-compete clause. Athlete's Foot, No. 00-0186, 2000 WL 426186, at *11-12 ("The covenant-not-to-compete set forth in the Operating Agreement is designed to prevent not only sales that might result from the prohibited competition, but primarily to prevent a disturbance in the relationship between [franchisor] and its customer base, and the goodwill developed for the stores operated by [franchisor] and its authorized franchisees, specially in the Pittsburgh market. The consequences of this disturbance with customer relationships is unascertainable and not capable of being fully compensated by money damages."). Here, Plaintiff is irreparably harmed by Defendants' operation of a

competing business, Pearly's, in violation of the non-compete clause contained in the Franchise Agreement. Id.

In addition, if Plaintiff is unable to enforce the non-compete clause contained in this Agreement, the values of all of its franchises are lowered. DBI Inv. Corp., No. 96-306, 1996 WL 165518, at *5. The Franchise Agreement at issue here is similar to agreements Plaintiff enters into with other franchisees. The value of Plaintiff's franchise is lowered if it is unable to enforce a non-compete clause. This inability could induce other franchisees to violate their franchise agreements and to use the goodwill established by the operation of their Rita's franchise to establish a competing business.

In light of the foregoing, the Court finds that Plaintiff will suffer irreparable harm if the relief sought is not granted. This factor favors granting injunctive relief.

**C. Harm to Plaintiff Outweighs Possible Harm to Defendants**

The Court finds that the harm to Plaintiff that will result if the Court does not enjoin Defendants from operating a competing business, see section B *supra*, outweighs any harm to Defendants. Defendants were aware of any potential harm when they signed the Franchise Agreement and then opened a competing shop following the termination of the Franchise Agreement, in violation of paragraph 17.3 of the Franchise Agreement. Maaco, No. 09-4548, 2010 WL 1644278, at *4. "[T]he harm to [D]efendants is of their own making." DBI Inv. Corp., No. 96-306, 1996 WL 165518, at *5. Accordingly, this factor favors a grant of injunctive relief.

### D. The Public Interest

Although not a primary concern in the instant case, "the public interest is served by fulfilling the contractual interests of the parties and maintaining the viability of franchise systems." Maaco, No. 09-4548, 2010 WL 1644278, at *4; see also DBI Inv. Corp., No. 96-306, 1996 WL 165518, at *5 ("Although not heavily implicated in the instant case, the public interest supports contractual enforcement by preventing competition in violation of a valid restrictive covenant."). Therefore, the public interest is served by granting injunctive relief.

### E. Injunction Bond

In accordance with Fed. R. Civ. P. 65(c), the Court will require Plaintiff to post an injunction bond in the amount of $50,000. This amount is required to cover damages Defendants may suffer if they have been wrongfully enjoined. The amount is based on evidence presented by Defendants' estimating their annual gross profit from the operation of their Franchise. (Defendant Exhibit 16 ("Ex. D-16 ").)

## VII. CONCLUSION

Since Plaintiff has shown a reasonable probability of success on the merits, that irreparable harm will result if the relief sought is not granted, that the harm it faces outweighs the possible harm to Defendants, and that granting relief is in the public interest, the Court will grant Plaintiff's Motion for a Preliminary Injunction (Doc. No. 2). Defendants are enjoined from selling competing products at Pearly's Sweets. Specifically, Plaintiffs are enjoined from selling soft serve ice cream, Pearly's Italian ice, "Pearlatis" and "Pearly's Shakes." In addition, Defendants are enjoined from using Rita's proprietary batch machines to produce any product for

sale that is similar to products offered by Rita's Franchises. In accordance with Fed. R. Civ. P. 65(c), the Court will require Plaintiff to post a bond in the amount of $50,000.

An appropriate Order follows.